**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL UNION NO. 639,

    Plaintiff,

    v.

AIRGAS, INC.,

    Defendant.

Civil Action No. TDC-17-0577

**MEMORANDUM OPINION**

On March 6, 2017, Defendant Airgas, Inc.[1] ("Airgas") a company engaged in the provision of gases for medical and industrial uses, will move two operational functions from its Hyattsville, Maryland facility to facilities in Montgomeryville, Pennsylvania and Linthicum Heights, Maryland.  As a result, 13 positions held by members of Plaintiff International Brotherhood of Teamsters, Local Union No. 639 ("the Union") will be eliminated.  The Union, contending that this transfer of functions violates the terms of its collective bargaining agreement with Airgas, has filed this action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (2012), seeking an injunction to bar Airgas from relocating those operations pending arbitration of the dispute.  On February 28, 2017, the Union filed a Motion for a Temporary Restraining Order ("TRO") as well as a Motion for a Preliminary Injunction.  On March 1, 2017, Airgas submitted a consolidated Memorandum in Opposition to those Motions.  The Court has considered the documentary evidence submitted by the parties and held

---

[1] In its Memorandum in Opposition to the pending Motions, Defendant notes that its legal name is Airgas USA, LLC, rather than Airgas, Inc., as used by Plaintiffs in the caption.

a hearing on March 2, 2017 at which it heard witness testimony and oral argument, thus rendering moot the Motion for a TRO. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974) (stating that a temporary restraining order in a federal case is to be limited to "preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"). Based on the findings of fact and conclusions of law set forth below, the Motion for a Preliminary Injunction is GRANTED.

## FINDINGS OF FACT

The Union is a labor organization within the meaning of the LMRA, 29 U.S.C. § 185(b), and represents approximately 65 employees working at Airgas's Hyattsville, Maryland facility. Airgas is an employer engaged in an industry or activity affecting commerce within the meaning of the LMRA, 29 U.S.C. § 185(a), and the National Labor Relations Act, 29 U.S.C. § 152(2). The Union and Airgas are parties to a Collective Bargaining Agreement ("CBA") effective June 15, 2014 to June 14, 2018.  That agreement has three Articles relevant here.[2]  Article 9 reserves to Airgas the exclusive right to manage its business as it sees fit in all matters not expressly governed by the CBA, in particular to "[s]ell, lease, transfer, move, change location, discontinue, relocate all or part of the business or operations provided timely notice is given the Union and effects bargaining is offered."  CBA Art. 9, Compl. Ex. 1 at 17-18, ECF No. 1-1.

Article 10, entitled "Subcontracting," provides that Airgas "shall not subcontract, transfer, lease assignment or conveyance [*sic*] in whole or in part, directly or indirectly, any work or service of the kind, nature or type covered by the [CBA], and presently performed or hereafter assigned to the collective bargaining unit."  *Id.* at 19.  Article 10 further provides that Airgas

---

[2]   Page citations are to the page numbers assigned by the Court's CM/ECF filing system.

shall not "be part of, or permit, any other work arrangement whereby such work or services may be performed by other than employees of the employer in the collective bargaining unit covered by [the CBA]." *Id.*

Article 18 establishes a grievance and arbitration procedure that "shall be the sole and exclusive means for the determination of all disputes, complaints, controversies, claims or grievances whatsoever arising pursuant to the terms and conditions of the [CBA]." *Id.* at 30.

In a letter dated February 1, 2017, Airgas informed the Union that it "tentatively" planned to "completely shut down and move two discrete parts" of the Hyattsville facility, specifically the High Pressure Resisting and Liquid Can Repair function (the "HPRLCR function") and the Small Medical Oxygen filling function (the "SMO function"). Feb. 1, 2017 Ltr., Compl. Ex. 3, ECF No. 1-3. Airgas stated that the HPRLCR function would be moved to Airgas's Montgomeryville, Pennsylvania facility and that the SMO function would be relocated to Airgas's Linthicum Heights, Maryland facility. Neither the Montgomeryville nor the Linthicum Heights facility utilizes union employees. Airgas concluded the letter by assuring the Union that any resulting reductions in the Hyattsville facility workforce would be imposed in compliance with the CBA.

In a February 2, 2017 responsive letter, the Union asserted that Airgas's plan violated Article 10 of the CBA because it amounted to a transfer of bargaining unit work and requested additional information about the plan. In a letter dated February 9, 2017, Airgas disputed the applicability of Article 10, which it deemed to be limited to subcontracting, and asserted that its plan fell under Article 9's provision reserving for management the decision to relocate all or part of the business. Airgas stated that the relocation of work was motivated not by costs savings, but by the resulting ability to achieve "efficiencies" based on consolidating operations, move work to

the geographic areas where there was higher demand, improve customer service, and comply with federal requirements regarding the storage of gases and chemicals.  Feb. 9, 2017 Ltr. at 4, Compl. Ex. 5, ECF No. 1-5.  Airgas's second letter also set a date for the transfer, tentatively calendaring it for March 3, 2017, and provided a chart indicating that 11 Union employees could be subject to lay-offs as a result of the transfer.  Airgas also stated that it was currently seeking to hire individuals to fill five new positions to conduct the transferred work at the Montgomeryville facility.

On February 13, 2017, the parties met in an unsuccessful effort to resolve the issue, prompting the Union to file a formal grievance on February 17, 2017.  In that grievance, the Union asked Airgas to stay any transfer until the grievance was resolved and proposed that both sides waive the preliminary grievance steps set forth in the CBA and proceed to expedited arbitration.  On February 22, 2017, Airgas denied the Union's grievance, citing Article 9 of the CBA, and refused to stay its transfer plan or to participate in expedited arbitration.

Airgas presently plans to execute on the transfer of the HPRLCR and SMO functions beginning on March 6, 2017, when it will begin physically to move equipment out of the Hyattsville facility.  According to the testimony of Airgas Assistant Vice President of Operations Joel Young, several pieces of equipment will be moved to the Montgomeryville site.  Specifically, one of two Hyattsville valve machines will relocated, a process that, because of the size and self-contained nature of the machine, requires the machine to be loaded onto a flat-bed, tractor-trailer.  Airgas will also move a paint booth, a 12' x 12' x 14' enclosed unit used for repainting gas canisters.  Relocating the paint booth requires that it be dismantled into four sections and reassembled after transport.  In addition to these two large pieces of equipment, Airgas will be moving various "consumable" parts, such as disposable valves and paint, and a

computer system that controls one of the machines.  Only consumables will be moved to the Linthicum Heights facility; the two pieces of SMO equipment at the Hyattsville facility will instead be placed into storage.  Young asserted that all of the equipment removed from Hyattsville could be returned if required.

According to the testimony of John Gibson, the Secretary-Treasurer of the Union, he observed during a visit to the Hyattsville facility on March 1, 2017 that the process of preparing the equipment for shipment or storage was already underway.  Sometime after his earlier visit to the facility a week before, various parts of the paint booth had been dismantled, and one of the machines was no longer operational.  Workers informed Gibson that they had been specifically instructed to begin dismantling the paint booth and that some supplies had already been shipped to Montgomeryville.

Airgas plans to convert some of the Hyattsville facility space opened up by the relocation into storage facilities for nitrous oxide and various chemicals.  Such a storage area is required to bring Airgas's practices into compliance with Food and Drug Administration ("FDA") regulations regarding the storage of nitrous oxide and Department of Homeland Security ("DHS") requirements for the storage of "chemicals of concern."  Feb. 9, 2017 Ltr. at 5. Airgas's previous storage practices had been found deficient during a recent DHS audit. Specifically, Airgas plans to repurpose one room previously used for the relocated operations into a unit dedicated to the "safe and secure" storage of nitrous oxide and plans to utilize "freed-up yard space and cages" to bring its storage of other chemicals into compliance with federal requirements.  *Id.*

As for personnel, Airgas now estimates that the transfer will result in the loss of 13 Union positions at the Hyattsville facility.  Because of vacancies, pending transfers, conduct-based

terminations, and employees presently on family or medical leave, only one or two layoffs will occur immediately.  However, others would follow when employees on leave return to work. Several drivers told Gibson during his March 1, 2017 visit to the Hyattsville facility they were concerned that with the SMO facility gone, their delivery routes would shrink, and noted that Airgas had already sent drivers from the Linthicum Heights facility to Hyattsville to learn their routes.[3]  Thus, to the extent not covered by the planned lay-offs, such reductions in delivery activities could further reduce the work available to Union members.

Hyattsville employees who endure lay-offs will be eligible for recall under the terms of the CBA.  Airgas offered, as part of effects bargaining, to give such employees preferential consideration for openings at the Montgomeryville and Linthicum Heights facilities or severance benefits, but the Union rejected the proposal.  As it turns out, Airgas has already hired and begun to train the five new employees that it stated in its February 9, 2017 letter it would hire for HPRLCR work at the Montgomeryville facility.

## DISCUSSION

The Union filed suit seeking a preliminary injunction from this Court to stay the transfer of the HPRLCR and SMO functions pending arbitration.  Airgas does not contest that the dispute between the parties relates to the terms of the CBA and thus must be resolved through arbitration by the terms of that agreement, but it opposes the Union's request for a stay of the transfer pending arbitration.

---

[3]   The Court considers this hearsay evidence for purposes of the Motion because the nature of preliminary injunction motions justifies relaxation of normal evidentiary standards. *G.G. ex rel Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725-26 (4th Cir. 2016), *cert. granted on other grounds*, 137 S. Ct. 369 (2016) (holding that a district court may consider hearsay evidence on a preliminary injunction motion because such a motion is "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits" (citation omitted)).

I.       **Legal Framework**

The Norris–LaGuardia Act, 29 U.S.C. §§ 101-115 (2012), provides that, in general, no federal court "shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute." 29 U.S.C. § 101.  However, in *Boys Markets, Inc. v. Retail Clerk's Union, Local 770*, 398 U.S. 235 (1970), the United States Supreme Court held that the Norris–LaGuardia Act does not prohibit a federal court from enjoining a strike where the union and employer are bound by a collective bargaining agreement and that agreement provides for binding arbitration of the dispute giving rise to the planned strike.  *Id.* at  253; *see also Buffalo Forge v. United Steelworkers of Am., AFL–CIO*, 428 U.S. 397, 406-07 (1976) (clarifying that the *Boys Market* exception extends only to cases where the dispute is one that the parties are contractually bound to arbitrate).  The Court found this exception because a refusal to arbitrate is not the type of abuse against which the Norris–LaGuardia Act was directed and because the inability to issue such an injunction would be "a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes." *Boys Markets*, 398 U.S. at 242, 253. This emphasis on the strong policy preference for arbitration has prompted lower courts to interpret *Boys Markets* to create a general exception allowing federal courts to issue injunctions to maintain the *status quo*, even without a threatened strike, where the parties' dispute is subject to a binding arbitration clause in the collective bargaining agreement. *See, e.g., Lever Bros. Co. v. Int'l Chemical Workers Union, Local 217*, 554 F.2d 115 (4th Cir. 1976); *Aluminum Workers Int'l Union, AFL–CIO, Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437, 441 (6th Cir. 1982).

Ordinarily, to obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each of the *Winter* requirements. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Because of the jurisdictional limitations deriving from the Norris–LaGuardia Act, "special considerations" apply when a court is considering a motion for preliminary injunction pursuant to *Boys Market* to maintain the *status quo* pending mandatory arbitration. *Columbia Local Am. Postal Workers Union v. Bolger*, 621 F.2d 615, 617 (4th Cir. 1980). In such cases, "[c]ourts must avoid reaching the merits of arbitrable disputes" and must instead determine whether the dispute is arbitrable and whether it is necessary to "preserve the status quo" to maintain the integrity of the arbitral process. *Drivers, Chauffeurs, Warehousemen and Helpers Teamsters Local Union No. 71 v. Akers Motor Lines, Inc.*, 582 F.2d 1336, 1342 (4th Cir. 1978).

Thus, the Court focuses on the "injury which would occur to the arbitral process" if the *status quo* is not preserved. *Lever Bros.*, 554 F.2d at 122. The arbitration process is harmed where injuries caused by the employer's action cannot be remedied by the arbitrator, thereby making the arbitration "but an empty victory for the union." *Id.* (citing *Bhd. of Locomotive Eng'rs v. Missouri–Kansas–Texas R. Co.*, 363 U.S. 528, 534-35 (1960)). An injunction may only issue if it "is necessary to protect the arbitral process itself." *Bolger*, 621 F.2d at 617. The

test for issuance of such an injunction "is whether the conduct proposed must be enjoined because the available arbitral process could not possibly restore the *status quo ante* in an acceptable form were that conduct to be found violative of contract rights." *Id.* at 618.  Thus, an injunction is warranted if the inability "to return the parties substantially to the *status quo ante*" would render the arbitral process "a hollow formality." *Lever Bros.*, 554 F.2d at 123; *see Bolger*, 621 F.2d at 618.

## II.      Irreparable Harm

Having conceded that the dispute is subject to arbitration, Airgas's primary argument against the issuance of a *Boys Market status quo* injunction is its claim that the actions it will take in moving the HPRLCR and SMO operations out of the Hyattsville facility can be fully undone by an arbitrator.  If the Court concludes that an arbitrator can "restore the *status quo ante* in an acceptable form," no injunction may issue.  *Bolger*, 621 F.2d at 618.   To the contrary, the Union argues that the relocation of the operations to other plants and the loss of 13 Union positions to those facilities cannot, as a practical matter, be fully unwound.

The United States Court of Appeals for the Fourth Circuit has upheld *Boys Market status quo* injunctions in cases involving the relocation of company operations to other plants.  In *Lever Brothers*, for example, the Fourth Circuit held that the district court properly issued a preliminary injunction halting a company's plan to permanently move its entire operation from a plant in Baltimore, Maryland to one in Hammond, Indiana until arbitration could occur.  *Lever Bros.*, 554 F.2d at 122.   The Court concluded that without an injunction, the relocation of the operations would have been a *fait accompli*, and the employees at the Baltimore plant would have permanently lost their positions.  *Id.*  Thus, the injunction was warranted because even if the arbitrator found in favor of the union, there would have been no means for the arbitrator to

ensure the resurrection of the Baltimore plant.  *Id.*   Likewise, the Fourth Circuit upheld another *status quo* injunction in *Akers*, where the union sought to enjoin the employer, a hauling company, from shutting down its union-staffed "general commodities division" and selling off its trucks and terminals before arbitration could take place.  *Akers*, 582 F.2d at 1338.  The trucks were then leased back for use in the company's non-union "special commodities division," to which most of the general commodities work had allegedly been transferred.  *Id.* at 1338-39.  In the same time period, the company laid off approximately 1200 union workers and hired 166 new non-union drivers.  *Id.* at 1339.  The court upheld the district court's grant of injunctive relief because, in part, "[i]f the remaining terminals and vehicles are sold, there will be no jobs" for union members to be assigned to, making the arbitrator unable to return the parties to their pre-grievance positions.  *Akers*, 582 F.2d at 1341.

By contrast, in *Bolger*, the Fourth Circuit held that the district court erred in issuing a *status quo* injunction where a union was challenging the United States Postal Service's decision, following the gradual moving of mail processing work from a post office to a central facility, to eliminate a mail processing work shift at the post office and transfer those shift workers to other positions in the same office, with residual effects on those workers' seniority and leave time.  621 F.2d at 616-18.  Noting that no employees would lose their jobs and that there had been "no showing that [the] jobs were less secure," the Court determined that the reorganization could, if found to be a violation of the parties' agreement, be sufficiently undone by an arbitrator so as to return the parties to their original positions.  *Id.* at 618.  In so ruling, the *Bolger* court relied on *Amalgamated Transit Union, Division 1384 v. Greyhound Lines, Inc.*, 550 F.2d 1237 (9th Cir. 1977), in which the United States Court of Appeals for the Ninth Circuit reversed a district court's issuance of a preliminary injunction pending arbitration, holding that in a dispute about

whether Greyhound could unilaterally alter driver's work schedules, the employer's actions did not frustrate the arbitration process because if the union prevailed in arbitration, "the situation can be restored substantially to the status quo *ante*." *Id.* at 1239; *see also Bolger*, 621 F.2d at 618; *Lever Bros.*, 554 F.2d at 122 (distinguishing *Greyhound*).

Here, the facts place this case much closer to those in *Lever Brothers* and *Akers* than to *Bolger* and *Greyhound*. As in *Lever Brothers*, Airgas will be permanently relocating entire operational functions out of one facility and moving them to others, including a facility in another state. Although Airgas attempts to distinguish *Lever Brothers* by noting that the Hyattsville location will remain open and claims that the transfers of the HPRLCR and SMO operations could be easily undone, the evidence suggests otherwise. The hearing testimony established that the transfer will require the dismantling and moving of several large pieces of equipment out of the Hyattsville facility either to Montgomeryville or into storage. One piece of equipment is so large that it will need to be transported on a flat-bed tractor-trailer. Thus, although the entire plant is not moving as in *Lever Brothers*, Airgas's proposed course of action involves a qualitatively similar physical relocation, even if on a smaller scale.

The physical relocation of the operations is significant not only because it makes it more difficult to return to the *status quo ante*, but also because it will lead to the execution of Airgas's avowed future plans for the Hyattsville facility. Airgas has repeatedly asserted, both in its correspondence with the Union and in affidavits submitted to the Court, that it will convert the vacated space in Hyattsville into storage facilities for gases and chemicals, including re-purposing one of the vacated rooms into a dedicated storage area for nitrous oxide. Airgas states that it is required to create such new storage facilities to comply with DHS and FDA requirements. Given that Airgas has refused to consider expedited arbitration, and the parties

agree that arbitration in the normal course will take six months to one year to complete, the physical gap left by the move of the HPRLCR and SMO equipment will undoubtedly be filled during that time frame by this activity.  Once the space is re-purposed, an arbitrator's order to return to the *status quo ante* would impose upon Airgas the untenable requirement to reconfigure its physical facility in a way that undoes an activity necessary to comply with federal regulations and requirements.  With Airgas having claimed, through counsel, that, absent the transfer it must otherwise construct or lease new space to carry out this storage function, it is not realistic to conclude that Airgas could simply undo the physical transfer of the HPRLCR and SMO functions.  Thus, for all intents and purposes, once the HPRLCR and SMO facilities are moved, the Hyattsville factory will no longer be able to accommodate those operations, amounting to a shuttering of the factory doors for those units.  *See Lever Bros.,* 522 F.2d at 122.

In addition, as in *Lever Brothers* and *Akers*, certain employees at the Hyattsville facility will be losing their jobs permanently.  Although on a smaller scale, the Airgas transfer of functions will result in the loss of 13 positions, representing approximately 20 percent of the Union's positions at the Hyattsville facility.  A prolonged "discharge of employees from positions long held" might render it "impossible" to make the employees themselves "whole in any realistic sense."  *Bhd. of Locomotive Eng'rs v. Missouri–Kansas–Texas R. Co.*, 363 U.S. 528, 534-35 (1960) (noting, in a case where the district court had preliminarily enjoined a railroad-workers strike, that under such circumstances "the action of the district judge, rather than defeating the [National Labor Relations] Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory").  By itself, the lay-off of employees would not necessarily warrant a *status quo* injunction.  *See, e.g.*, *Consolidated Aluminum*, 696 F.2d at 433 (vacating a

pre-arbitration injunction staying the company's plan to restructure its job classifications, even though it would result in the termination of 16 employees, where there was no apparent barrier to its ability to restore the eliminated positions).  Here, however, Airgas has gone further.  Airgas has already started to set up a competing operation—outside the ambit of the CBA—with five newly hired, non-union employees at the Montgomeryville facility.  *See Akers*, 582 F.2d at 1339 (noting that, while lay-offs were taking place, the company was hiring 166 new, non-union employees in the division taking over the work of union employees who had been subject to lay-offs).  It did so after offering to the Union that Hyattsville workers subject to lay-offs would be given preference for new positions in Montgomeryville. Thus, with some positions already replaced with new workers, and with arbitration of the grievance perhaps taking up to a year, the Montgomeryville HPRLCR operation will almost certainly become strongly rooted enough to make ordering the return of those positions to Hyattsville infeasible.  The combination here of the physical relocation of entire operational functions and the permanent loss of positions, some of which have already been replaced, would not permit an arbitrator to return the parties to the *status quo ante*.  *See Lever Bros.*, 554 F.2d at 122-23.

In light of this evidence, *Bolger*, the case on which Airgas primarily relies, is clearly distinguishable.  As in *Greyhound*, the proposed action in *Bolger* consisted of altering employees' work assignments within the same facility.  621 F.2d at 617.  No employees lost their jobs, and there was no imminent closure and relocation of physical operations.  *Id.* at 618. The Court therefore concludes that the Union has met its burden of establishing that the transfer of the HPRLCR and SMO operations from the Hyattsville facility to the Montgomeryville and Linthicum Heights facilities, respectively, would likely cause irreparable harm to the arbitral

process because that transfer would amount to a "*fait accompli*" that would render arbitration "a hollow formality." *Lever Bros.*, 554 F.2d at 122-23.

### III.    Additional Factors

Having concluded that the dispute is subject to arbitration and that a *status quo* injunction is permissible under these facts, the Court turns to the traditional factors that must be considered before issuing a preliminary injunction:  (1) likelihood of success on the merits; (2) likely irreparable harm; (3) the balance of the equities; and (4) the public interest. *Winter*, 555 U.S. at 20.

As discussed above, the Union has established likely irreparable harm because in the absence of an injunction, the physical relocation and loss of positions will prevent the arbitrator from ordering a return to the *status quo*. *See supra* part II.

The remaining factors are also satisfied.  As to likelihood of success on the merits, the question is whether the Union is likely to succeed not on the merits of the underlying dispute, but on its assertion that the dispute is subject to mandatory arbitration. *See Akers,* 582 F.2d at 1342 (holding that the district court "misconstrued" the likelihood of success requirement to necessitate a showing that the union would prevail on the merits of its dispute); *Lever Bros.*, 554 F.2d at 119 (finding that an injunction properly issued where the district court "equated" the union's likelihood of success on the merits with "the likelihood that the Union would prevail in its contention that the dispute in issue was one for the arbitrator").  Airgas concedes that the underlying dispute between the parties stems from competing interpretations of the CBA and thus is subject to arbitration by the terms of that agreement.  The Union is thus likely to succeed on the merits of its claim that this dispute is one that must be resolved through arbitration.

As for the balance of equities, in their communications with the Union about the proposed transfer, Airgas stated that while the transfers would enable certain "efficiencies," it did not anticipate any labor cost savings to result.   As to any harm that would result from an injunction, Airgas asserted that it now has to pay the five newly hired Montgomeryville employees.   This potential harm, however, appears to be one of Airgas's own making, since it chose to hire these employees after the Union had first raised concerns about the relocation in its letter of February 1, 2017.   *See* Feb. 9 Ltr. at 4 (stating that as of that date, Airgas was "actively recruiting" for those positions).   Airgas also asserts that it runs the risk of a non-compliant DHS audit of the Hyattsville facility if it does not convert the vacated space to a storage area for certain gases and chemicals of concern.   At the hearing, however, Airgas counsel acknowledged that DHS had not ordered Airgas to take any particular compliance steps by a date certain. Weighed against these potential harms is the immediate harm to the Union of the imminent loss of at least one position, assurances of additional layoffs in the near future, and the official loss of 20 percent of its positions at the Hyattsville facility.   It also faces the reality that even if the Union were to prevail in arbitration, the return of any eliminated positions would not be feasible. *See supra* part II.   Considering these factors, particularly the loss of employment for certain Union workers, the Court concludes that the risks to the Union from the transfer proceeding before arbitration is completed are greater both in degree and in kind than those faced by Airgas if the transfer is stayed while arbitration unfolds.   The Court therefore finds that the scale tips in favor of the Union.

Finally, the public interest favors an injunction.   The Court returns to *Boys Markets*, where the Supreme Court emphasized the importance "of a mechanism for the peaceful resolution of labor disputes," and the need to make available "equitable relief in the arbitration

context" as part of that mechanism.  398 U.S. at 253.  The public has an interest in arbitration as a means of resolving labor disputes, and it has a concomitant interest in ensuring that the conditions of that arbitration result in meaningful, rather than hollow, resolution.  Because the public interest aligns with the principle that no injury should be done to the arbitration process, the Court finds that this factor favors the issuance of an injunction.  With all four *Winter* factors established, the Court may grant the requested *status quo* injunction.

## IV.    Expedited Arbitration

The Union has also asked that the Court require Airgas to engage in expedited arbitration. However, any mandated timeline for arbitration must be found in the CBA's grievance procedure over which the parties bargained and to which they agreed. *See Akers*, 582 F.2d at 1343.   For this Court to impose any other timeline would be "to, in effect, re-write the terms of that agreement," which would deprive the parties of their bargain.  *Id.*   In light of this Court's determination as to the *status quo* injunction, the parties are, of course, free to negotiate any timeline for arbitration that they wish.

## V.    Bond

Under Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Court finds that both parties suggested bond amounts miss the mark.  The Union asserts that only a nominal amount is necessary because Airgas has acknowledged that the relocation of functions does not generate any labor cost savings.  Airgas, however, seeks $70,000 per month.  Not only has Airgas failed to produce evidence to support this amount, but the vast majority of this amount likely arises from the payment of wages to new employees who were

hired after this dispute began.  Moreover, these employees are non-union personnel, and Airgas has not claimed that they are subject to an employment contract that requires Airgas to retain them or pay them prior to the actual relocation of work to Montgomeryville.  The Court therefore does not accept Airgas's proposed figure.  Nevertheless, in order to ensure that there are funds to compensate Airgas should it successfully establish that the preliminary injunction should not have issued, and that they wrongfully sustained damages as a result of this injunction, the Court requires the Union to post a bond of $5,000.  That bond must be posted by March 8, 2017. Failure to post the bond will result in dissolution of the injunction.

### CONCLUSION

For the foregoing reasons, the Union's Motion for a Temporary Restraining Order is DISMISSED AS MOOT.  The Union's Motion for a Preliminary Injunction is GRANTED. Airgas is ordered to maintain the *status quo* in this matter until issuance of a final and binding arbitration award.  Specifically, Airgas is enjoined from relocating the HPRLCR function and SMO function units of its Hyattsville, Maryland facility to other facilities, including relocating any HPRLCR and SMO function equipment or materials from the Hyattsville, Maryland facility to other facilities; and from making any reductions in or alterations to staffing of the HPRLCR function and the SMO function units of its Hyattsville, Maryland facility.  A separate Order shall issue.


Date:   March 3, 2017                                _____/s/_____
                                                      THEODORE D. CHUANG
                                                      United States District Judge